IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,　　　　　:
　　　　　　　　　　　　　　　　　:
　　　Plaintiff,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
$142,523.98 IN FUNDS SEIZED　　　:
FROM JP MORGAN CHASE BANK　　　　:
ACCOUNT XXXXXX4577 HELD IN THE　:
NAME OF VEND CONSULTING GROUP,　:
INC.; $109,818.12 IN FUNDS　　　 :
SEIZED FROM WELLS FARGO BANK　　:
ACCOUNT XXXXXXXXX1279 HELD IN　 :
THE NAME OF DANIIL B. RUBINSKIY :
AND "EDR" (A MINOR); $64,315.59 :
IN FUNDS SEIZED FROM WELLS FARGO :
BANK ACCOUNT XXXXXXXXX3621 HELD IN : 　CIVIL ACTION
THE NAME OF DANIIL AND NATELLA　:
RUVINSKIY; $39,524.19 IN FUNDS　:
SEIZED FROM WELLS FARGO BANK　　:
ACCOUNT XXXXXXXXX3456 HELD IN THE : 　NO.:_____
IN THE NAME OF DANIIL AND NATELLA :
RUVINSKIY; $27,715.05 IN FUNDS　:
SEIZED FROM WELLS FARGO BANK　　:
ACCOUNT XXXXXXXXX2664 HELD IN THE :
NAME OF ANCHOR FREIGHT SERVICE; :
$21,644.48 IN FUNDS SEIZED FROM :
JP MORGAN CHASE BANK ACCOUNT　　:
XXXXX5470 HELD IN THE NAME　　　:
OF VEND CONSULTING GROUP, INC.; :
$10,475.68 IN FUNDS SEIZED FROM :
JP MORGAN CHASE BANK ACCOUNT　　:
XXXXX1092 HELD IN THE NAME OF　 :
NOVOMARINE CONTAINER LINE, INC.; :
$5,585.40 IN FUNDS SEIZED FROM :
WELLS FARGO BANK ACCOUNT　　　　:
XXXXXXXXX3164 HELD IN THE NAME OF :
DANIIL B. RUVINSKIY AND NATELLA :
RUVINSKIY; $3,238.22 IN FUNDS　 :
SEIZED FROM JP MORGAN CHASE　　 :
BANK ACCOUNT XXXXX5395 HELD IN :
THE NAME OF NOVOMARINE CONTAINER :
LINE LLC.; $660.81 IN FUNDS SEIZED :

```
FROM WELLS FARGO BANK ACCOUNT          :
XXXXXXXXX1339 HELD IN THE NAME OF       :
DANIIL B. RUVINSKIY AND NATELLA         :
RUVINSKIY REAL ESTATE ACCOUNT;          :
ANY AND ALL FUNDS IN WELLS FARGO        :
ADVISORY STOCK ACCOUNT XXXX3031         :
HELD IN THE NAME OF DANIIL              :
RUVINSKIY; ANY AND ALL FUNDS IN         :
WELLS FARGO ADVISORY STOCK              :
ACCOUNT XXXX3032 HELD IN THE            :
NAME OF DANIIL RUVINSKIY; ANY           :
AND ALL FUNDS IN WELLS FARGO            :
ADVISORY STOCK ACCOUNT XXXX5901         :
HELD IN THE NAME OF DANIIL              :
RUVINSKIY; ANY AND ALL FUNDS IN         :
SUNTRUST BANK ACCOUNT                   :
XXXXXXXXX8145 HELD IN THE NAME OF       :
ANCHOR FREIGHT SERVICES, INC.;          :
ONE 2008 MASERATI QUATTROPORTE          :
M139, VIN ZAMFE39AX80033491; ONE        :
2010 ACURA MDX ADVANCE, VIN             :
2HNYD2H7XAH512456; AND ASSORTED         :
COMPUTER EQUIPMENT,                     :
                                        :
       Defendants.                      :
```

## COMPLAINT FOR FORFEITURE

COMES NOW the United States of America, Plaintiff in the above-styled civil action, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and files this Complaint for Forfeiture, showing the Court as follows:

1.

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1355.

2.

Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355,

1391 and 1395.

3.

On or about December 7, 2011, agents with Immigration and Custom Enforcement ("ICE") seized a 2008 Maserati Quattroporte M139, VIN ZAMFE39AX80033491 ("the Defendant Maserati"), and assorted computer equipment ("the Defendant Assorted Computer Equipment") from Daniil Ruvinskiy at 12395 Morris Road, Suite 106, Alpharetta, Fulton County, Georgia and a 2010 Acura MDX Advance, VIN 2HNYD2H7XAH512456 ("the Defendant Acura"), from Natella Ruvinskiy at 12897 Gransley Court, Alpharetta, Fulton County, Georgia, both places within the jurisdiction and venue of this Court.

4.

On or about December 7, 2011, agents with the Department of the Treasury, Internal Revenue Service Criminal Investigations ("IRS-CI") seized $109,818.12 in funds from Wells Fargo Bank account XXXXXXXXX1279 held in the name of Daniil B. Rubinskiy and "EDR" (a minor) ("the Defendant $109,818.12"); $64,315.59 in funds from Wells Fargo Bank account XXXXXXXXX3621 held in the name of Daniil and Natella Ruvinskiy ("the Defendant $64,315.59"); $39,524.19 in funds from Wells Fargo Bank account XXXXXXXXX3456 held in the name of Daniil and Natella Ruvinskiy ("the Defendant $39,524.19"); $27,715.05 in funds from Wells Fargo Bank account

XXXXXXXXX2664 held in the name of Anchor Freight Service ("the Defendant $27,715.05"); $5,585.40 in funds from Wells Fargo Bank account XXXXXXXXX3164 held in the name of Daniil B. Ruvinskiy and Natella Ruvinskiy ("the Defendant $5,585.40"); $660.81 in funds from Wells Fargo Bank account XXXXXXXXX1339 held in the name of Daniil b. Ruvinskiy and Natella Ruvinskiy Real Estate Account ("the Defendant $660.81"); any and all funds in Wells Fargo Advisory stock account XXXX3031 held in the name of Daniil Ruvinskiy ("the Defendant Account 3031 funds"); any and all funds in Wells Fargo Advisory stock account XXXX3032 held in the name of Daniil Ruvinskiy ("the Defendant Account 3032 funds"); and any and all funds in Wells Fargo Advisory stock account XXXX5901 held in the name of Daniil Ruvinskiy ("the Defendant Account 5901 funds").

5.

On or about December 8, 2011, IRS-CI agents seized $21,644.48 in funds from JP Morgan Chase Bank account XXXXX5470 held in the name of Vend Consulting Group, Inc. ("the Defendant $21,644.48"); $3,238.22 in funds from JP Morgan Chase Bank account XXXXX5395 held in the name of Novomarine Container Line LLC ("the Defendant $3,238.22"); and any and all funds in Suntrust Bank account XXXXXXXXX8145 held in the name of Anchor Freight Services, Inc. ("the Defendant Suntrust funds").

6.

On or about December 9, 2011, IRS-CI agents seized $142,523.98 in funds from JP Morgan Chase Bank account XXXXXX4577 held in the name of Vend Consulting Group, Inc. ("the Defendant $142,523.98").

7.

On or about December 13, 2011, IRS-CI agents seized $10,475.68 in funds from JP Morgan Chase Bank account XXXXX1092 held in the name of Novomarine Container Line, Inc. ("the Defendant $10,475.68").

8.

All of the above-listed Defendant properties are presently within the jurisdiction of this Court and are being held in secure locations or in a government account maintained by the United States Department of the Treasury.

9.

Since at least August 2008, agents with IRS-CI, ICE, and the Federal Bureau of Investigations ("FBI") have been investigating Daniil B. Ruvinskiy, Alexander Vagner, Valerey Baranouski, Anchor Freight Service, Vagner Inc. DBA Auto-Tic, All Transport Export, and All Transport Depot for violations of, among other things, Title 13, United States Code, Section 305 (unlawful export information); Title 18, United States Code, Section 554 (smuggling goods from the United States); Title 18, United States Code,

Section 1343 (wire fraud); and Title 18, United States Code, Section 1957 (money laundering).  ICE Special Agent Sheila S. Olive ("Special Agent Olive") IRS Special Agent Dorethia Wood-Brown ("Special Agent Wood-Brown") have been involved in the investigation.

10.

Pursuant to Title 13, United States Code, Section 305(a), it is unlawful for any person to knowingly fail to file or knowingly submit "false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES)."

11.

Pursuant to Title 18, United States Code, Section 554,  it is unlawful for any person to fraudulently or knowingly export or send from the United States, or to attempt to export or send from the United States, "any merchandise, article, or object contrary to any law or regulation of the United States," or receive, conceal, buy, sell, or in any manner facilitate "the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States."

12.

Pursuant to Title 18, United States Code, Section 1343, it is

unlawful to transmit, or cause to be transmitted, any writings in interstate and foreign commerce to effectuate a scheme to fraudulently export merchandise from the United States in violation of Title 18, United States Code, Section 554.

13.

Pursuant to Title 18, United States Code, Section 1957, it is a crime to engage or attempt to engage in a monetary transaction involving criminally derived property having a value greater than $10,000, knowing that the property was derived from a specified unlawful activity. Exportation of merchandise in violation of Title 18, United States Code, Section 554 is a specified unlawful activity as defined by 1956(c)(7).

14.

Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957 is subject to forfeiture to the United States.

15.

Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting a "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense, is subject to forfeiture to the United States.

7

16.

The following definitions apply to the allegations listed in this Complaint for Forfeiture:

a. A "freight forwarder" is a person or company that organizes international shipments for individuals or other companies by booking or otherwise arranging space for these shipments with carriers. Freight forwarders typically arrange cargo movement to an international destination.  They possess the expertise that allows them to prepare and process the documentation pertaining to international shipments including submitting required documentation to Customs and Border Protection ("CBP") prior to export.

b. An "Exporter" is the person in the United States that receives the primary benefit, whether monetary or otherwise, of the export transaction.  An exporter is also referred to as the U.S. Principal Party in Interest.

c. A "shipping container" is a standardized reusable steel box used for the safe, efficient, and secure storage and movement of vehicles within a global intermodal freight transport system, e.g., the

shipping line.

d.   A "shipping company" refers to a company that is hired by an exporter to load vehicles into shipping containers for the safe transport during international transit.

e.   A "booking report" refers to arrangements made with the carrier, such as a shipping line, to reserve space on a vessel for goods being transported.

f.   A "customs export validation stamp" refers to a CBP perforated stamp embossed on each vehicle title once CBP has vetted and cleared the vehicle to be exported from the United States.  For the Port of Savannah, this stamp includes the Savannah Port code of "1703," the date that CBP validated or cleared the document, and the letters "CBP."  For the Port of Charleston, this stamp includes the Charleston Port code of "1601," the date that CBP validated or cleared the document, and the letters "CBP."

g.   A "Vehicle Identification Number" ("VIN") is a unique, 17-character serial number used by the automotive industry to identify individual motor vehicles.

h.  "Export" refers to the transportation of merchandise out of the United States for the purpose of being entered into the commerce of a foreign country.

i.  A "Shipper Exportation Declaration" ("SED") serves as a regulatory document. Furthermore SED's are required on all shipments with commodities valued over $2,500 or Postal shipments valued over $500. SED's do not leave the United States with the other documentation required for export. Instead, the SED is delivered to the exporting carrier (airline or vessel line) who presents it to CBP at the port of export.

j.  The "Automated Export System" ("AES") is a computer system that collects Electronic Export Information ("EEI"). In this case, the AES is being used to prepare and submit SED's to United States Customs and Border Protection.

17.

The process of exporting vehicles from the United States involves a series of transactions completed by multiple entities. The typical administrative process related to the exportation of vehicles from the United States is as follows:

a. An exporter presents vehicles to a shipping company to be loaded into shipping containers for export.

b. The exporter then provides a freight forwarding company with a valid Certificate of Title and the bill of sale, or the value of the vehicle, for each car presented for export.

c. The freight forwarder is responsible for booking space with an international cargo carrier as well as submitting to CBP, at least 72 hours prior to export, the original Certificate of Title (or a certified copy of the Certificate of Title), two complete copies of the original Certificate of Title (or certified copies of the original), and a self addressed, postage paid, return envelope. The freight forwarder is responsible for preparing and submitting the SED to CBP with the containers for export. The SED's can be submitted manually, via mail, or via AES, using a computer system.

d. CBP will run database queries to insure that the vehicle is not stolen and that it does not have a current lien holder. CBP will also input the Vehicle Identification Number into indices annotating the vehicle as being exported.

e.   Once the above-described vetting process of each
     vehicle is complete, CBP will perforate with its
     Customs export validation stamp each original title
     and the two (2) sets of copied titles.

f.   CBP returns to the freight forwarder the stamped,
     original plus one copy of the Certificate of Title,
     who, in turn, returns the original title back to
     the exporter and retains the remaining copied title
     for its records.  Pursuant to 19 C.F.R. § 163, the
     freight forwarder is required to maintain these
     validated copies for a period of five (5) years.

g.   The freight forwarder provides the international
     shipping line with the CBP-validated Certificate of
     Title for each vehicle to be exported.

h.   The shipping company arranges transport of the
     shipping containers to the port specified by the
     freight forwarder.

i.   Once the containers arrive at the Port, CBP has the
     option of physically inspecting the goods loaded
     into the shipping container or allowing it to be
     loaded onto the ship without inspection.

                         18.

Daniil Ruvinskiy ("Ruvinskiy") owns and operates Anchor

Freight Services, Inc. ("AFS"), a freight forwarding company that is located at 12395 Morris Road, Suite 106 in Alpharetta, Georgia.

19.

The investigation has revealed that AFS primarily provides transportation and logistic services for export shipments of vehicles to Russia, the Baltic States, other European countries, and the United Arab Emirates.

20.

According to records on file with the Georgia Secretary of State's Office, AFS was incorporated on December 13, 2002.

21.

AFS utilizes the Web domain of Anchor Transport Inc. at www.anchortrans.com.

22.

On or about March 16, 2011, while reviewing and inspecting export shipments from the Port of Savannah, CBP placed on "hold" five shipping containers that each held vehicles for export, thus preventing their scheduled exportation from the United States.

23.

The address on the booking report for those five shipping containers matched database records for a company known as Gold State, who CBP previously identified as having attempted to export vehicles using fraudulent titles.

24.

The five containers were placed on hold and detained, and a physical exam was scheduled to be conducted on the containers.

25.

The physical exam did not yield any adverse findings regarding the vehicles within the containers, but a review of Customs documentation revealed that none of the required export documents had been presented to and cleared by CBP for any of the five shipping containers.

26.

As a result, CBP declined to release the five shipping containers until receiving the proper Certificates of Title for the vehicles within the containers.

27.

On March 29, 2011, a Notice of Detention was faxed to Empire United Lines ("Empire"), located at 2303 Coney Island Avenue, Brooklyn, New York 11223, who is the listed the freight forwarder for the five shipping containers.

28.

A CBP officer informed Empire that five containers were placed on hold and were being detained pending review of the original Certificates of Title for the vehicles contained therein.

29.

Empire stated it had sent the Certificates of Title to the steamship line, Mediterranean Shipping Company ("MSC"), located in Charleston, South Carolina.

30.

Based on this information, CBP officials contacted MSC, who stated that it had received scanned titles, via email, from AFS rather than Empire, for three of the containers in question.

31.

MSC provided CBP officials with email correspondence dated March 15, 2011 it had received from AFS employee Inna E. Altman ("Altman").   The email correspondence had attached to it an electronic file containing supposedly validated titles for three of the five containers.

32.

The   sender   address   on   the   email   from   Altman   was "inna.altman@anchor-trans.com."

33.

While reviewing the documentation received from MSC, CBP officials determined that the paperwork had been fraudulently validated with a CBP Export Validation Stamp ("Stamp") listing "Savannah Port Code 1703" as the validating port and a validation date of March 14, 2011.

34.

A review of records in the CBP's systems showed that the Vehicle Identification Numbers for the vehicles associated with the fraudulently-Stamped Certificates of Title had not been reported as being slated for export through the Port of Savannah.

35.

The National Insurance Crime Bureau had not recorded any export information for the Vehicle Identification Numbers for those vehicles or for the shipment.

36.

Based on the ICE agent's knowledge, training, experience, and review of the records, the agent believed that the original Certificates of Title never been presented to CBP for validation and proper export.

37.

On March 30, 2011, a CBP officer assigned to the Savannah outbound team requested from the vehicles' exporter, Wolfgang's Auto Sales, the original Certificates of Title for each vehicle found in the five shipping containers.

38.

On March 31, 2011, CBP officials received the original Certificates of Title for the questioned vehicles via FedEx from Ruvinskiy at AFS.

39.

None of Certificates of Title that AFS submitted contained the Stamp as required for export.

40.

From their training and experience, Special Agent Olive and Special Agent Wood-Brown know that having the original Certificate of Title stamped by CBP officials is a customary validation procedure on the part of freight forwarders and that, unlike with these five containers, the CBP validation always occurs prior to the vehicles being presented for export.

41.

Because the original Certificates of Title received from Ruvinskiy on March 31, 2011 did not contain a Customs Stamp, Special Agent Olive and Special Agent Wood-Brown believe that the Certificates of Title delivered by email from inna.altman@anchor-trans.com to MSC contained fraudulent Stamps and constitute an attempt to circumvent federal export laws by bypassing CBP's validation process of the vehicles' titles prior to exportation.

42.

The investigation revealed that between April 1, 2011, and April 7, 2011, AFS reserved shipping container space for three shipping containers in order to export a total of nine vehicles,

i.e., three vehicles per container.

43.

The investigation revealed that the Certificates of Title for three vehicles - all 2011 Lexus Sport Utility Vehicles - were never presented to CBP for validation and instead contained fraudulent validation Stamps.

44.

The investigation also revealed that AFS e-mailed the three fraudulently stamped Certificates of Title to MSC using inna.altman@anchor-trans.com and that the three fraudulently Stamped Certificates of Title were emailed on or about April 5, 2011 and contained a fraudulent stamp dated April 4, 2011.

45.

Agents have conducted an examination of each of the fraudulently Stamped titles, which revealed identical features that corresponded with many of the Stamps on other vehicle titles that AFS presented to MSC.

46.

The investigation revealed that each of the fraudulent Stamps dated April 4, 2011 and March 14, 2001, show identical size, shape and shading features.

47.

The examination of the titles AFS presented to MSC and CBP

also show that the fully legible CBP Stamp is mispositioned and well off the side of the copied vehicle titles, rather than located entirely within the border of the title and approximately 1-inch from the left border.

48.

Based on their examination of the titles and their training and experience, Special Agents Olive and Wood-Brown believe that Ruvinskiy and AFS are using some sort of overlay, embossing machine, or some other instrumentality to produce fraudulently CBP-validated titles or copies of titles and that this process would leave an original title in pristine, i.e., unvalidated, form.

49.

According to ICE agents, this practice is synonymous with "cloning" practices, wherein an individual uses an original title of one car to falsely apply for a title to a similar make and model vehicle that has been stolen and had its VIN plates changed, thereby giving the appearance that the cloned vehicle is a legitimate vehicle with clear title.

50.

On September 23, 2011, Savannah CBP officials contacted ICE Special Agent Scott concerning a container with four vehicles and miscellaneous goods recently exported from the Port of Savannah wherein the vehicle titles presented to MSC were fraudulently

validated.

51.

From their investigation, CBP officials knew that the titles to those four vehicles were fraudulently validated, because CBP was still in possession of the original vehicle titles that had not yet been embossed with the CBP stamp.

52.

The investigation also revealed that the titles for those four vehicles were presented by Novomarine Container Line LLC ("Novomarine"), a company operated by Ruvinskiy.

53.

In February 2011, Elena Sokolovskaya ("Sokolovskaya") of Novomarine filed an application with the Federal Maritime Commission for a license as a non-vessel operating common carrier and ocean freight forwarder.

54.

The address that Sokolovskaya listed on the application was 1647 Capesterre Drive, Orlando, Florida 32824, and she listed Novomarine's officers as Ruvinskiy and Aleksey Y. Demshin.

55.

Records on file with Florida Department of State, Division of Corporations, show that Aleksey Y. Demshin and Denis Trofimov organized Novomarine on October 10, 2010 and that on January 25,

2011, Daniil B. Ruvinskiy was added as a managing member of the business.

### 56.

The investigation has revealed that on September 20, 2011, Sokolovskaya, in the name of Novomarine, e-mailed what appeared to be CBP-embossed vehicle titles and dock receipts to the MSC Vessel Reconciliation Manager, thus representing that a CBP officer had cleared the titles to those four vehicles.

### 57.

The signature block for Sokolovskaya contained the address of 12395 Morris Road, Ste 106, Alpharetta Georgia 30005, which is the address for AFS.

### 58.

Alexander Vagner ("Vagner") owns and operates Vagner Inc. DBA Auto-Tic ("Vagner Inc."), which is an exporter and shipping company located in Alpharetta, Georgia.

### 59.

According to records on file with the Georgia Secretary of State's Office, Vagner Inc. was incorporated on September 26, 2000.

### 60.

The investigation has revealed that Vagner Inc. primarily acts as the principal party in interest providing services as a shipping company.

61.

The investigation has also revealed that Vagner Inc. uses AFS for transportation and logistic services connected with the export of shipments of vehicles to Russia, the Baltic States, other European countries, and the United Arab Emirates.

62.

From their investigation, agents learned that Vagner Inc. takes orders from overseas clients for vehicles located in the United States and that it receives funds via wire transfer from Eastern European countries, primarily Russia, for the purchase of the vehicles in the United States.

63.

From their investigation, agents learned that Vagner Inc. is responsible for loading the vehicles into shipping containers for the safe transport during international transit and for transporting those containers to the port of export that AFS has specified, typically either the Port of Savannah or the port of Charleston.

64.

On or about December 01, 2010, Special Agent Wood-Brown interviewed Vagner, and he stated that he receives overseas orders for vehicles and that he then receives funds from the client via wire transfer into his business bank account, which is Bank of

America account number XXXXXXXX5557 held in the name of Vagner Inc. DBA Auto-Tic.

65.

Vagner further stated that he buys, loads, and transports boats, ATVs, automobiles, motorcycles, and jet skis for his overseas clients.

66.

Vagner also stated that he only purchases the vehicles and loads them into containers for shipping and that he uses AFS for all of his shipments.

67.

Vagner told Special Agent Wood-Brown that Ruvinskiy prepares the SED documents for the cargo to be shipped and that his shipments are generally shipped from Charleston, North Carolina and Savannah, Georgia.

68.

Vagner stated that he has been doing business with Ruvinskiy for seven years and that he has known Ruvinskiy for seven or eight years.

69.

Vagner stated that Ruvinskiy gives him a good price on the shipping since Ruvinskiy deals with large shipping companies and since Ruvisnkiy was only an agent, not a loader like himself.

70.

Vagner told Special Agent Wood-Brown that he provides Ruvinskiy with documents and values for the vehicles, the titles, and the Vehicle Identification Numbers for the vehicles to be shipped.

71.

According to Vagner, Ruvinskiy, as the freight forwarder provides the value of each vehicle to CBP on the Shipper's Export Declaration ("SED") document.

72.

Agents reviewed various documents and discovered that from January 2007 through November 2011, Vagner utilized AFS, which is owned and operated by Ruvinskiy, for freight forwarding services, that AFS prepared Vagner Inc.'s SED documents to include the titles of each vehicle to be shipped for the inspection by CBP, and that Ruvinskiy arranged for the export of the containers of vehicles.

73.

As part of the investigation, agents analyzed the SED's and the bank records for Ruvinskiy and Vagner from January 2007 thru December 2008.

74.

From the investigation, agents learned that the vehicles were significantly undervalued for the purpose of avoiding the receiving

countries' duty payment.

75.

The investigation also revealed that Ruvinskiy essentially utilized the Department of Commerce's Automated Export System ("AES"), a computer based system, to circumvent the United States established international export laws.

76.

The agents believe that the undervaluation of the exported vehicles makes each SED a false document, which was fraudulently entered into the AES as a legal document in violation of Title 13, United States Code, Section 305 and Title 18, United States Code, Section 554, and then electronically transmitted to the Department of Commerce, in violation of Title 18, United States Code, Section 1343.

77.

The investigation has revealed that Vagner paid Ruvinskiy large amounts of money to carry out this scheme.

78.

As part of their investigation, agents reviewed bank records for the years 2007 through 2008 as well as Vagner's tax documents for 2007 and 2008, including corporate tax returns and all work papers associated with the corporate tax returns for Vagner Inc.

79.

The bank records show that Vagner spent a total of $6,180,715.37 and $7,460,996.01 in 2007 and 2008, respectively, for the purchase of vehicles from various auto auctions and auto dealerships.

80.

The tax records revealed that Vagner reported cost of goods sold in 2007 and 2008 as $6,162,095 and $8,142,390 for the purchase of vehicles.

81.

Vagner's work papers show that for the tax years 2007 and 2008, Vagner's total inventory expenses were $6,124,157.80 and $7,773,736.00.

82.

Thus, from their review, agents determined that the numbers from Vagner's bank records, tax records, and work papers concerning the purchase of vehicles in 2007 and 2008 are consistent.

83.

Agents also reviewed the SEDs submitted for the export of those same vehicles and discovered that the values of the vehicles listed on those SEDs for 2007 and 2008 were documented as $5,389,623.00 and $5,744,674.00, substantially less than the true value of the vehicles as shown by Vagner's bank records, tax

records, and work papers.

84.

Based on their investigation, the agents believed that the SEDs submitted for those vehicles were false.

85.

The investigation has revealed that each of those false SEDs was completed by AFS, Ruvinskiy's business.

86.

In reviewing the bank records, the agents learned that Vagner received funds from overseas in 2007 and 2008, with 97% of those funds coming from Russian clients and that those funds were deposited into Bank of America business banking account XXXXXXXX5557, held in the name of Vagner Inc. DBA Auto-Tic.

87.

The bank records also reveal that Vagner then paid Ruvinskiy substantial amounts of money for the services of preparing and processing the aforementioned fraudulent SEDs with the undervalued vehicles for the purpose of exporting goods from the United States.

88.

Bank records reveal that in 2007 and 2008, Vagner paid Ruvinskiy $344,545 in 2007 and $421,900 in 2008 for his preparing the fraudulent SEDs.

89.

Bank records show that Ruvinskiy deposited most of Vagner's payments into Wells Fargo/Wachovia bank account XXXXXXXXX2664 held in the name of Anchor Freight Service ("Wells Fargo 2264") and that he transferred funds from Wells Fargo 2264 and made other deposits of Vagner's payments into his other various bank accounts, including, but not limited to, the following:

(a)   Wells Fargo Bank account XXXXXXXXX3456 held in the name of Daniil and Natella Ruvinskiy ("Wells Fargo 2664");

(b)   Wells Fargo Bank account XXXXXXXXX3621 held in the name of Daniil and Natella Ruvinskiy ("Wells Fargo 3621");

(c)   Wells Fargo Advisory stock account XXXX5901 held in the name of Daniil Ruvinskiy ("Wells Fargo 5901");

(d)   Wells Fargo Advisory stock account XXXX3031 held in the name of Daniil Ruvinskiy ("Wells Fargo 3031");

(e)   Wells Fargo Advisory stock account XXXX3032 held in the name of Daniil Ruvinskiy ("Wells Fargo 3032");

(f)   Wells Fargo Bank account XXXXXXXXXX1279 held in the name of Daniil B. Rubinskiy and "EDR" (a minor) ("Wells Fargo 1279");

(g)   Wells Fargo Bank account XXXXXXXXX3164 held in the name of Daniil B. Ruvinskiy and Natella Ruvinskiy ("Wells Fargo 3164"); and

(h)   Wells Fargo Bank account XXXXXXXXX1339 held in the name
      of Daniil B. Ruvinskiy and Natella Ruvinskiy Real Estate
      Account ("Wells Fargo 1339").

90.

Bank records show that Ruvinskiy made total deposits into
Wells Fargo 2264 in 2007 and 2008 in the amounts of $110,500.00 and
$545,250.00 respectively.

91.

Bank records show that Ruvinskiy withdraws funds that are
maintained in Wells Fargo 2264 and subsequently deposits those
funds into other bank accounts he owns or controls, including but
not limited to, Wells Fargo 3164 and Wells Fargo 1279.

92.

On or about November 21, 2008, Ruvinskiy purchased the real
property located at 12897 Gransley Court, Alpharetta, Fulton
County, Georgia ("the Gransley Court property") for $1,125,000.00.

93.

Records show that Ruvinskiy made a down purchase payment of
$250,000 to purchase the Gransley Court property.

94.

Bank records show that Ruvinskiy paid the balance for the
purchase of the Gransley Court property as follows:

(a)   check number 092, drawn on Wells Fargo/Wachovia bank

29

account number XXXXXXXXXX4280 and in the amount of $100,000;

(b)   check number 094, drawn on Wells Fargo 3164 and in the amount of $650,000; and

(c)   check number 095, drawn on Wells Fargo 1279 and in the amount of $100,000.

95.

Agents reviewed SED information for the years 2009, 2010, and 2011, and from their review, the agents believe that the above-described scheme continued throughout those years.

96.

From their review of the SEDs, the agents learned that Vagner listed fraudulent values for exported vehicles in 2009, 2010 and 2011 of $983,438.00, $1,426,140.00, and $2,149,312.00 respectively, which is less than he listed in 2007 and 2008.

97.

From their investigation, the agents learned that Russia increased the amount of import duty it imposed during 2009 and 2010, and the agents believe that, as a result of the high import duty, Vagner had significantly less business in 2009 and 2010 than in previous years.

98.

The investigation has also revealed that in mid-2011, Russia

lowered the imposed duty on imported goods, and since that time, Vagner and Ruvinskiy's SED activity in the above-described scheme has increased.

99.

Bank records show that in 2009, 2010, and 2011 (January 2011 through April 2011), Ruvinskiy received payments from Vanger in a pattern consistent with that described above.

100.

Bank records show that in the years 2009, 2010, and 2011 (January 2011 through April 2011), Ruvinskiy received payments from Vagner totaling $196,180.00, $159,814.00, and $53,348.00 respectively.

101.

The investigation revealed that on December 1, 2011, Ruvinskiy e-mailed a total of four titles to a shipping line which CBP agents identified as fraudulent.

102.

The investigation revealed that those four fraudulent titles listed Ruvinskiy as the freight forwarder and Valery Baranouski ("Baranouskiy") as the loader.

103.

From their investigation, agents learned that Baranouski is a loader of vehicles to be exported and is the owner of All Transport

Export, which is located at 4224 Shackleford Road in Norcross, Georgia.

104.

On two previous occasions during this investigation, Baranouski told an undercover agent that Ruvinskiy is his freight forwarder and that he has primarily used Ruvinskiy since 2004.

105.

Bank records reveal that Ruvinskiy has received funds on numerous occasions from Barnouski.

106.

On December 2, 2011, Special Agents Olive and Wood-Brown obtained from the District Court for the Northern District of Georgia seizure warrants for Wells Fargo 1279, Wells Fargo 3621, Wells Fargo 3456, Wells Fargo 2664, Wells Fargo 3164, Wells Fargo 1339, Wells Fargo 3031, Wells Fargo 3032, Wells Fargo 5901, the Defendant Maserati, and the Defendant Acura.

107.

On Defendant 7, 2011, agents executed the aforementioned seizure warrants and seized the Defendant $109,818.12, the Defendant $64,315.59, the Defendant $39,524.19, the Defendant $27,715.05, the Defendant $5,585.40, the Defendant $660.81, the Defendant Account 3031 funds, the Defendant Account 3032 funds, the Defendant Account 5901 funds, the Defendant Maserati, and the

Defendant Acura.

108.

On December 7, 2011, agents with ICE, IRS-CI, and the FBI executed a federal search warrant at AFS' business location at 12395 Morris Road Suite 106, Alpharetta, GA 30005.

109.

During the search of AFS' business location, the agents seized the Defendant Assorted Computer Equipment, more particularly described as follows:

(a)  one Dell Dimension desktop computer, serial number 6JX5Y51;

(b)  one Dell Vostro desktop computer, serial number 5FWYKN1;

(c)  one Dell Dimension desktop computer, serial number 393CV91;

(d)  one generic black desktop computer with no serial number; and

(e)  one Western Digital external hard drive, serial number WMAL92148763

110.

Agents told Ruvinskiy that he was not in custody, and they asked Ruvinskiy if he was willing to talk with them.

111.

Ruvinskiy agreed to talk to the agents without an attorney,

33

and at least two times during the interview, agents told Ruvinskiy that if he wanted an attorney, they would stop the interview.

112.

During the interview, Ruvinskiy admitted that he possessed a fraudulent Stamp that he used to export vehicles from the United States.

113.

The agents asked Ruvinskiy if he was exporting stolen vehicles, and Ruvinskiy stated that he may have, in fact, shipped stolen vehicles.

114.

During the interview, Ruvinskiy told the agents that he also operates Novomarine Container Line LLC and that he is responsible for SEDs entered into the AES under the name of Novomarine.

115.

Ruvinskiy told the agents that he submits the SEDs into the AES computer and that he inputs the values for the vehicles that are given to him.

116.

Ruvinskiy first denied knowing that the vehicles listed on the SEDs were undervalued. Ruvinskiy, however, later told the agents that he knew, based on the particular vehicle, that some of the vehicles were significantly undervalued when he entered the vehicle

information into the AES.

117.

During the search of AFS' business location, agents found bank account information for three additional bank accounts.

118.

Agents found a checkbook for JP Morgan Chase Bank account xxxxx5470 held in the name of Vend Consulting Group, Inc. ("JP Morgan 5470"), and agents observed that the address listed on the account was the Gransley Court property, i.e., Ruvinskiy's home address.

119.

Records on file with the Georgia Secretary of State's Office show that Ruvinskiy incorporated Vend Consulting Group, Inc. on January 7, 2011 and that he is listed as the CEO and registered agent of the company while his wife, Natella Ruvinskiy, is listed as the CFO and Secretary.

120.

Agents also found bank information for JP Morgan Chase Bank account XXXXX5395 held in the name of Novomarine Container Line LLC (JP Morgan 5395"), and agents observed that the address listed on the account is the same as the business address for AFS.

121.

On top of the desk in Ruvinskiy's office, agents found bank

account information, including deposit slips, for SunTrust Bank account XXXXXXXXX8145 held in the name of Anchor Freight Services Inc. ("SunTrust 8145").

122.

On December 7, 2011, IRS-CI Special Agent Darrell Waldon ("Special Agent Waldon") obtained from the District Court for the Northern District of Georgia seizure warrants for JP Morgan 5470, JP Morgan 5395, and SunTrust 8145.

123.

On December 8, 2011, Special Agent Waldon executed the seizure warrants for JP Morgan 5470, JP Morgan 5395, and SunTrust 8145 and seized the Defendant $21,644.48, the Defendant $3,238.22, and the Defendant SunTrust funds.

124.

When he executed the seizure warrants at JP Morgan Chase Bank, Special Agent Waldon learned that Ruvinskiy also held an additional related savings account at that bank, namely account number XXXXXX4577 held in the name of Vend Consulting Group, Inc. ("JP Morgan 4577").

125.

Consequently, on December 9, 2011, Special Agent Waldon obtained from the District Court for the Northern District of Georgia a seizure warrant for JP Morgan 4577.

126.

That same day, Special Agent Waldon executed the seizure warrant for JP Morgan 4577 and seized the Defendant $142,523.98.

127.

On or about December 13, 2011, Special Agent Wood-Brown learned that Ruvinskiy also held an additional related account at that JP Morgan Chase Bank, namely account XXXXX1092 held in the name of Novomarine Container Line, Inc. ("JP Morgan 1092").

128.

Consequently, on December 13, 2011, Special Agent Wood-Brown obtained from the District Court for the Northern District of Georgia a seizure warrant for JP Morgan 1092.

129.

That same day, Special Agent Wood-Brown executed the seizure warrant for JP Morgan 1092 and seized the Defendant $10,475.68.

130.

In violation of 18 U.S.C. § 1957, Ruvinskiy engaged or attempted to engage in one or more monetary transactions in criminally derived property having a value greater than $10,000, knowing that the property was derived from unlawful activity. Furthermore, said property was, in fact, derived from specified unlawful activity, namely a violation of Title 18, United States Code, Section 554.

131.

The Defendant $142,523.98, the Defendant $109,818.12, the Defendant $64,315.59, the Defendant $39,524.19, the Defendant $27,715.05, the Defendant $21,644.48, the Defendant $10,475.68, the Defendant $5,585.40, the Defendant $3,238.22, the Defendant $660.81, the Defendant Account 3031 funds, the Defendant Account 3032 funds, the Defendant Account 5901 funds, the Defendant SunTrust funds, the Defendant Maserati, the Defendant Acura, and the Defendant Assorted Computer Equipment are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), because they are involved in or are traceable to a money laundering transaction or an attempted money laundering transaction in violation of 18 U.S.C. § 1957.

132.

The Defendant $142,523.98, the Defendant $109,818.12, the Defendant $64,315.59, the Defendant $39,524.19, the Defendant $27,715.05, the Defendant $21,644.48, the Defendant $10,475.68, the Defendant $5,585.40, the Defendant $3,238.22, the Defendant $660.81, the Defendant Account 3031 funds, the Defendant Account 3032 funds, the Defendant Account 5901 funds, the Defendant SunTrust funds, the Defendant Maserati, the Defendant Acura, and the Defendant Assorted Computer Equipment are also subject to forfeiture to the United States pursuant to 18 U.S.C. §

981(a)(1)(C), because they constitute or were derived from proceeds traceable to a specified unlawful activity, namely a violation of Title 18, United States Code, Section 554.

133.

WHEREFORE, Plaintiff prays:

(1)   that the Court forfeit all of the Defendant properties to the United States of America;

(2)   that the Court award Plaintiff the costs of this action; and

(3)   that Plaintiff have such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

This  16th  day of April, 2012.

Respectfully submitted,

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

MICHAEL JOHN BROWN
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No.: 064437

600 United States Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
(404) 581-6131 - Phone
(404) 581-6234 - Fax
michael.j.brown2@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
|        v. | : | |
| | : | |
| $142,523.98 IN FUNDS SEIZED | : | |
| FROM JP MORGAN CHASE BANK | : | |
| ACCOUNT XXXXXX4577 HELD IN THE | : | |
| NAME OF VEND CONSULTING GROUP, | : | |
| INC.; $109,818.12 IN FUNDS | : | |
| SEIZED FROM WELLS FARGO BANK | : | |
| ACCOUNT XXXXXXXXX1279 HELD IN | : | |
| THE NAME OF DANIIL B. RUBINSKIY | : | |
| AND "EDR" (A MINOR); $64,315.59 | : | |
| IN FUNDS SEIZED FROM WELLS FARGO | : | |
| BANK ACCOUNT XXXXXXXXX3621 HELD IN | : | CIVIL ACTION |
| THE NAME OF DANIIL AND NATELLA | : | |
| RUVINSKIY; $39,524.19 IN FUNDS | : | |
| SEIZED FROM WELLS FARGO BANK | : | |
| ACCOUNT XXXXXXXXX3456 HELD IN THE | : | NO.:_____ |
| IN THE NAME OF DANIIL AND NATELLA | : | |
| RUVINSKIY; $27,715.05 IN FUNDS | : | |
| SEIZED FROM WELLS FARGO BANK | : | |
| ACCOUNT XXXXXXXXX2664 HELD IN THE | : | |
| NAME OF ANCHOR FREIGHT SERVICE; | : | |
| $21,644.48 IN FUNDS SEIZED FROM | : | |
| JP MORGAN CHASE BANK ACCOUNT | : | |
| XXXXX5470 HELD IN THE NAME | : | |
| OF VEND CONSULTING GROUP, INC.; | : | |
| $10,475.68 IN FUNDS SEIZED FROM | : | |
| JP MORGAN CHASE BANK ACCOUNT | : | |
| XXXXX1092 HELD IN THE NAME OF | : | |
| NOVOMARINE CONTAINER LINE, INC.; | : | |
| $5,585.40 IN FUNDS SEIZED FROM | : | |
| WELLS FARGO BANK ACCOUNT | : | |
| XXXXXXXXX3164 HELD IN THE NAME OF | : | |
| DANIIL B. RUVINSKIY AND NATELLA | : | |
| RUVINSKIY; $3,238.22 IN FUNDS | : | |
| SEIZED FROM JP MORGAN CHASE | : | |
| BANK ACCOUNT XXXXX5395 HELD IN | : | |

```
THE NAME OF NOVOMARINE CONTAINER    :
LINE LLC.; $660.81 IN FUNDS SEIZED  :
FROM WELLS FARGO BANK ACCOUNT       :
XXXXXXXXX1339 HELD IN THE NAME OF    :
DANIIL B. RUVINSKIY AND NATELLA     :
RUVINSKIY REAL ESTATE ACCOUNT;      :
ANY AND ALL FUNDS IN WELLS FARGO    :
ADVISORY STOCK ACCOUNT XXXX3031     :
HELD IN THE NAME OF DANIIL          :
RUVINSKIY; ANY AND ALL FUNDS IN     :
WELLS FARGO ADVISORY STOCK          :
ACCOUNT XXXX3032 HELD IN THE        :
NAME OF DANIIL RUVINSKIY; ANY       :
AND ALL FUNDS IN WELLS FARGO        :
ADVISORY STOCK ACCOUNT XXXX5901     :
HELD IN THE NAME OF DANIIL          :
RUVINSKIY; ANY AND ALL FUNDS IN     :
SUNTRUST BANK ACCOUNT               :
XXXXXXXXX8145 HELD IN THE NAME OF    :
ANCHOR FREIGHT SERVICES, INC.;      :
ONE 2008 MASERATI QUATTROPORTE      :
M139, VIN ZAMFE39AX80033491; ONE    :
2010 ACURA MDX ADVANCE, VIN         :
2HNYD2H7XAH512456; AND ASSORTED     :
COMPUTER EQUIPMENT,                 :
                                    :
        Defendants.                 :
```

## VERIFICATION OF COMPLAINT FOR FORFEITURE

I, Special Agent Dorethia Wood-Brown, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This _____ day of April, 2012.

SPECIAL AGENT DORETHIA WOOD-BROWN
INTERNAL REVENUE SERVICE
CRIMINAL INVESTIGATION